IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SAVE THE BULL TROUT, FRIENDS OF THE WILD SWAN, and ALLIANCE FOR THE WILD ROCKIES, | CV-19-184-M-KLD |
| Plaintiffs, | ORDER |
| vs. | |
| MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of the U.S. Fish and Wildlife Service, and DEB HAALAND, in her official capacity as Secretary of the Department of Interior, | |
| Defendants. | |

Save the Bull Trout, Friends of the Wild Swan, and Alliance for the Wild Rockies ("Plaintiffs") challenge the adequacy of the Bull Trout Recovery Plan issued by the United States Fish and Wildlife Service ("the Service") pursuant to Section 4(f) of the Endangered Species Act ("ESA"). Pending before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 24) and Martha Williams and Deb Haaland's Cross-Motion for Summary Judgment (Doc. 29). The Court held oral argument on the motions on June 14, 2021.

1

## I.     BACKGROUND

Bull trout (*Salvelinus confluentus*) are native salmonids to the waters of western North America. FWS00016. Bull trout can be resident or migratory, either spending their life cycle in a tributary or nearby stream, or migrating to a lake, river, or saltwater. FWS00019. In 1999, declines in the bull trout population resulting from human activities, habitat loss and fragmentation, interaction with nonnative species, and blockage of migratory corridors led the Service to list the species as threatened under the ESA. FWS00022. At the time of their listing, bull trout had been eradicated from approximately 60 percent of their historical range. FWS00022.

After the Service listed bull trout as a threatened species, it completed draft recovery plans in 2002 and 2004. FWS70806, FWS75087, FWS74497, FWS94215. The 2002 recovery plan addressed bull trout recovery for the Columbia River, Klamath River, and St. Mary-Belly River populations. The 2004 recovery plan addressed recovery for the Coastal-Puget Sound and Jarbidge River populations. The 2002 and 2004 draft recovery plans were not finalized and adopted. (Doc. 31 at ¶32.) The Service issued a final recovery plan for the species in 2015. FWS00002.

In 2016, Plaintiffs Alliance for the Wild Rockies and Friends of Wild Swan filed suit challenging the adequacy of the recovery plan under the Administrative Procedure Act ("APA") and the ESA. *See Friends of the Wild Swan, Inc. v. Thorson*, 260 F. Supp. 3d 1338 (D. Or. 2017), *aff'd sub nom. Friends of the Wild Swan, Inc. v. FWS*, 745 F. Appx. 718 (9th Cir. 2018). The District Court dismissed the APA claim with prejudice and dismissed the ESA claims with leave to amend. *Friends of the Wild Swan, Inc.*, 260 F. Supp. 3d at 1345. Plaintiffs declined to amend their complaint and the Ninth Circuit affirmed the District Court's judgment. *Friends of the Wild Swan*, 745 Fed. Appx. at 720.

Plaintiffs subsequently filed this action on November 18, 2019, again challenging the adequacy of the recovery plan. Defendants filed a Rule 12(b)(6) motion to dismiss, arguing res judicata barred Plaintiffs' claims. The undersigned issued findings on May 27, 2020 recommending Judge Christensen deny the motion to dismiss. (Doc. 10.) On July 29, 2020, the Court adopted the Findings and Recommendations in full and denied Defendants' motion to dismiss. (Doc. 15.) The parties thereafter filed the instant cross motions for summary judgment.

/ / /

/ / /

/ / /

## II. LEGAL STANDARDS

### a. Endangered Species Act

Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems they depend upon. 16 U.S.C. §1531(b). The Supreme Court has deemed the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 180 (1978). The hallmark of the ESA is its solemn resolve that endangered species "be afforded the highest of priorities" with the goal to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority*, 437 U.S. at 174, 184.

The ESA sets forth duties the Secretary of the Department of the Interior must comply with to further the goal of species protection. The Secretary "must identify endangered species, designate their 'critical habitats,' and develop and implement recovery plans." *Natural Resources Defense Council, Inc. v. United States Dept. of Interior*, 13 Fed. Appx. 612, 615 (9th Cir. 2001). These duties are in turn delegated to the Service. 50 C.F.R. § 402.01(b). The Service's compliance with the ESA's requirements for developing a recovery plan is at issue in this matter.

The ESA's recovery plan requirements are contained in Section 4(f) of the Act. 16 U.S.C. § 1533(f). The Secretary must develop and implement recovery plans "for the conservation and survival of endangered and threatened species . . . unless [s]he finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f). Each recovery plan must incorporate, "to the maximum extent practicable":

(i)    a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii)    objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii)    estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B). Plaintiffs contend the Bull Trout Recovery Plan is entirely void of objective, measurable criteria as required under the second component.

Once the Service decides a recovery plan is necessary to promote the conservation of the listed species, the Service has a nondiscretionary duty to incorporate the three recovery plan components listed above to the maximum extent practicable. *Center for Biological Diversity v. Zinke*, 399 F. Supp. 3d. 940,

946-47 (9th Cir. 2019).  It is the Service's alleged failure to perform a nondiscretionary duty under the ESA that confers jurisdiction upon this Court and allows Plaintiffs to bring this action. *Zinke*, 399 F. Supp. 3d at 946-47. "The ESA's citizen suit provision provides the primary mechanism for enforcing the ESA . . . This provision authorizes 'any person [with standing to] commence a civil suit . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.'" *Center for Biological Diversity v. Bernhardt*, 2020 WL 7640045, *2 (D. Mont. Dec. 23, 2020). *See also Zinke*, 399 F. Supp. 3d at 946 (The ESA's citizen suit provision "is cabined to challenges to the Secretary's nondiscretionary duties.") and 16 U.S.C. § 1540(g)(1)(C) ("any person may commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary").

b.     Summary Judgment

Courts review agency decisions under the ESA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017). The Rule 56 summary judgment standard is therefore modified in ESA cases; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A).

The APA standard of review is deferential. Courts must refrain from substituting their judgment for that of the agency and should limit their review of the agency's action to determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coalition v. Servheen*, 655 F.3d 1015, 1023 (9th Cir. 2011) (citing *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III. DISCUSSION

### a. Standing

The Service argues Plaintiffs lack standing because they have not shown that their members have suffered an injury in fact. The Service contends any harm to

Plaintiffs is hypothetical because the Service is not obligated to comply with the recovery plan's guidelines or criteria. The Service therefore disputes Plaintiffs' ability to establish the recovery plan directly or immediately affects their members.

Standing is a critical component of Article III's limitation on federal judicial power to "cases" and "controversies." U.S. Const., Art. III, § 2. *See also*, *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1146 (2013) ("One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue"). When a group brings a lawsuit on behalf of its members, the "irreducible constitutional minimum of standing" the group must meet is referred to as associational standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000). Only the first associational standing requirement, whether members could establish Article III standing in their own right, is implicated here.

To establishing Article III standing, Plaintiffs' members must set forth proof "(1) that [they] suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) of a causal connection

between the injury and the complained-of conduct; and (3) that a favorable decision will likely redress the alleged injury." *Alaska Right to Life Political Action Committee v. Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (quoting *Lujan,* 504 U.S. at 560.)

The Service challenges Plaintiffs' ability to establish an injury in fact. Plaintiffs allege its members have suffered a procedural injury, that is their "aesthetic, recreational, spiritual, and educational interests" in the survival and recovery of bull trout are harmed by the Service's failure to abide by Section 4(f)'s requirements, resulting in the "promulgation of an unlawful, inadequate recovery plan for bull trout[.]" (Doc. 1 at 4 & Doc. 25 at 34-35.) A plaintiff complaining of a procedural injury "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing[.]" *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003)).

Plaintiffs' claims sufficiently allege an injury in fact. First, "[a] 'concrete interest' implicated by a procedural requirement may reflect' aesthetic, conservational, and recreational' values[.]" *Center for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972)). Second, members of the plaintiff organizations have submitted

declarations establishing their concrete esthetic, recreational, scientific, spiritual, vocational, and educational interests in bull trout. (Docs. 25-1 & 25-2.) Finally, Plaintiffs claim that the Service violated Section 4(f)'s procedural requirements by neglecting to include objective and measurable criteria into the recovery plan. The ESA mandates the inclusion of objective and measurable criteria to protect "a concrete threatened interest that is the basis of [Plaintiffs'] standing, the avoidance of harm to listed species." *Salmon Spawning & Recovery Alliance*, 545 F.3d at 1229 (internal quotations omitted) (environmental group adequately alleged injury in fact resulting from government defendants' violation of the procedural requirements of the ESA). *See also*, *Center for Biological Diversity v. Bernhardt*, 480 F. Supp. 3d 69, 74-75 (2020) (environmental group claiming the Service failed to follow procedural requirements of Section 4(f) adequately alleged injury in fact requirement of Article III standing). Plaintiffs have met the bar required to establish a procedural injury in fact.

> b.  Objective and Measurable Criteria

Plaintiffs assert the recovery plan fails to include objective and measurable criteria as required under Section 4(f). A threshold issue raised by Plaintiffs' challenge is to what extent this Court may review the recovery plan. The discretionary nature of recovery plans significantly limits a court's ability to review their content. *Thorson*, 2017 WL 7310641 at *4-10 (completing a

painstaking review of recovery plan jurisprudence and concluding courts lack jurisdiction under the ESA citizen-suit provision to consider claims "challenging the general substance of a recovery plan.").

Although limited case law exists considering challenges to recovery plans, courts within the Ninth Circuit have consistently found the substance of recovery plans to be within the agency's discretion and therefore unreviewable. *Zinke*, 399 F. Supp. 3d at 946-49. For example, in *Thorson*, the District of Oregon found unreviewable claims challenging the way the Secretary addressed the items required under Section 4(f) rather than "the Secretary's failure to include these items." *Thorson*, 2017 WL 7310641, at *9. The court accordingly found the challenged conduct to be "discretionary and beyond the purview of the court." *Thorson*, 2017 WL 7310641, at *9. The Ninth Circuit affirmed these findings, holding that the claims "alleged no failure by the Service to perform a nondiscretionary duty" under Section 4(f). *Friends of the Wild Swan, Inc.*, 745 Fed. Appx. at 720.

This Court recently echoed these findings. In *Center for Biological Diversity*, this Court considered a challenge to the Service's failure to update its recovery plan for the grizzly bear. 2020 WL 7640045. After noting the inherently discretionary nature of recovery plans, this Court stated, "[a] court may review a recovery plan to the extent it is missing one of the required plan components

(absent a showing that its inclusion was 'impracticable'), but it may not entertain disagreements with the agency concerning the substance of those components[.]" *Center for Biological Diversity*, 2020 WL 7640045 at \*9 (internal citations omitted). *See also*, *Zinke*, 399 F. Supp. 3d at 948-49 (finding that although the content of recovery plans is discretionary, courts may consider challenges to the Secretary's failure to incorporate one of Section 4(f)'s requirements into a recovery plan); *Grand Canyon Trust v. Norton*, 2006 WL 167560, \*5 (D. Ariz. Jan. 18, 2006) (Secretary has a non-discretionary duty to include the Section 4(f) requirements into a recovery plan unless incorporating those requirements was "not practicable.").

This Court's review of the bull trout recovery plan is therefore limited to determining whether the plan incorporates "objective, measurable criteria." 28 U.S.C. § 1533(f). If the Court determines the Service incorporated objective and measurable criteria into the plan, the inquiry stops. The Court cannot then review the substance of that criteria for sufficiency; the way the Service chooses to incorporate the criteria is committed to its discretion. *Grand Canyon Trust*, 2006 WL 167560 at \*2 ("Determining how to provide for the conservation and survival of the [species]" is left to the discretion of the Secretary.).

In keeping with these parameters, the Court determines Plaintiffs' argument that the recovery plan violates the ESA because it does not contain a component

required by Section 4(f) (objective, measurable criteria) constitutes an alleged failure to act pursuant to a nondiscretionary duty. (Doc. 1 at 10.) Accordingly, the ESA's citizen-suit provision provides this Court with jurisdiction to hear the claim. *Zinke*, 399 F. Supp. 3d at 946 (The ESA's citizen suit provision "is cabined to challenges to the Secretary's nondiscretionary duties.") The Court will conduct a limited review of the plan to determine whether the Service has incorporated the requisite criteria.

Plaintiffs' objection to the Service's failure to incorporate objective, measurable criteria is based on multiple perceived deficiencies. First, Plaintiffs argue the plan includes only a single criterion that is neither objective nor measurable. Second, Plaintiffs argue the single criterion, when met, would not result in a delisting determination. Third, Plaintiffs argue the plan incorporates a 75% management threshold that is not scientifically based. Fourth, Plaintiffs argue the plan does not provide delisting criteria that address each delisting factor under the ESA. As discussed below, Plaintiffs' concerns largely amount to disagreements with the recovery plan's substance and are therefore out of this Court's jurisdictional purview. The Court will limit its review to whether the Service violated a non-discretionary duty under the ESA.

/ / /

1.  The Recovery Plan's Criteria

Here, the bull trout recovery plan contains recovery criteria specific to six bull trout recovery units. The recovery criteria for each recovery unit are individually addressed in six Recovery Unit Implementation Plans ("RUIPs"). The recovery criteria are based on primary threats to bull trout and require primary threats to be effectively managed in 75% of core areas in four recovery units, and effectively managed in 100% of core areas in two recovery units. FWS00009. The Service defines "primary threat" as follows:

> Threat factors known or likely (*i.e.*, non-speculative) to negatively impact bull trout populations at the core area level, and accordingly require management actions to assure bull trout persistence to a degree necessary that bull trout will not be at risk of extirpation within that core area in the foreseeable future.

FWS00089. The recovery plan identifies three broad categories of threats affecting bull trout: (1) habitat threats; (2) demographic threats; and (3) non-native species threats.[1] FWS00026. Each RUIP more thoroughly describes the specific primary threat factors affecting bull trout in each recovery unit.

---

[1] These three general categories of threats are further discussed in detail according to the listing factors affecting the status of bull trout. The factors include: the present or threatened destruction, modification, or curtailment of bull trout habitat range; overutilization for commercial, scientific, or educational purposes; disease and predation inadequacy of existing regulatory mechanisms; and other natural or manmade factors affecting bull trout existence. FWS00026-34.

The Service defines "manage threats" as:

> Threats to bull trout are addressed (*i.e.*, managed) so that ecologically viable populations of bull trout that have: (1) stable or increasing trends, (2) a distribution within the recovery unit that promotes a mosaic pattern in representative habitats across the recovery unit, (3) diverse life history strategies within populations, and (4) connectivity between populations and core areas to the maximum extent possible.

The recovery plan includes a "Threat Assessment Tool" to "objectively evaluate the status of threats affecting bull trout across the range of the species[.]" FWS000107. The tool "incorporates the best available data and scientific expert opinion participation . . . to evaluate the status of bull trout at the range-wide and recovery unit scales based on the analysis of threat management effectiveness at the core area level." FWS00108.

The Threat Assessment Tool functions by implementing the following components: an assessment workshop process; a threats assessment decision matrix; assessment of threats effectively managed; and evaluation of recovery unit status. FWS00108. The workshop process convenes biologists from various federal and state agencies to assess the status of bull trout and their primary threats in each core area within each recovery unit. FWS00108. As part of the workshop, the participating biologists will "evaluate all primary threats for each respective core area with respect to two independent metrics: threat severity and management effectiveness." FWS00108. The two metrics will then be "combined into a decision

matrix . . . to assess whether current management or conservation actions effectively address the threat."[2] FWS00108.

Using the matrix, the Service will assess "whether threats are being effectively managed for the core area being evaluated." FWS00108. Those findings will then be placed into a chart tallying the threats effectively managed in the core areas of each recovery unit.  FWS00108. The Service will also assess "the overall status of bull trout within a recovery unit and inform whether recovery criteria have been achieved" by evaluating "evidence of demographically stable populations of bull trout; and an evaluation of the adequacy of existing regulatory mechanisms to provide adequate protection of bull trout in the foreseeable future[.]" FWS00109. If the Threat Assessment Tool yields results indicating primary threats have been effectively managed in a recovery unit,[3] the Service "may consider initiating the status review process." FWS00109.

/ / /

---

[2] "Assessment of this decision matrix will be informed by existing empirical data on magnitude and trends in bull trout population counts or indices; current or historical spatial distribution, connectivity and extent of populations; expression of life history strategies; occurrence, magnitude, scope, trends, and severity of threats; and significant conservation measures that are ongoing or have been completed to address primary threats." FWS00163.

[3] As previously noted, the recovery criteria require primary threats to be effectively managed in 75% of core areas in four recovery units, and effectively managed in 100% of core areas in two recovery units.

## 2. The Parties' Arguments

Plaintiffs argue the Service's "effectively managed" recovery criterion is neither objective nor measurable. Plaintiffs contend the criteria relies on "extremely broad threat area[s]. . . categorized into . . . extremely subjective categories . . . for both severity and management effectiveness without any objective quantitative targets, benchmarks, or instructions regarding how to weight or rank different factors and different areas." (Doc. 25 at 24.) Plaintiffs further aver that "[w]ithout quantitative targets and a clear process explaining how to rank and weight different factors and different areas, there is simply no way for this process to be objective or even consistent among different reviewers." (Doc. 25 at 25.)

The Service counters Plaintiffs' argument by insisting objective and measurable delisting criteria are clearly discernable from the face of the recovery plan. In support, the Service points to the recovery plan's incorporation of the Threat Assessment Tool, numerical threshold criteria, and a species status assessment process that considers "available scientific and commercial information involving the bull trout's representation, redundancy, and resilience." (Doc. 30 at 20-21.) The Service maintains that utilization of these criteria will allow it to objectively evaluate the status of threats to bull trout and determine whether they have been effectively managed at the core area level. Finally, the Service contends

that Plaintiffs' challenges must fail as a matter of law because they amount to mere disagreements with the substance of the recovery plan.

### 3. Objective and Measurable Criteria in the Recovery Plan

Few courts have determined what constitutes objective, measurable criteria under Section 4(f). In *Strahan v. Linnon*, 967 F. Supp. 581, 599 (D. Mass. 1997), the court found the agency properly included objective, measurable criteria in the recovery plan for the Northern Right whale. The court based its findings on the plan's stated recovery goal of "7000 animals". *Strahan*, 967 F. Supp. at 599. Although the plaintiffs argued that number was "unrealistic and meaningless without a provision for interim goals", the court concluded otherwise because "nothing in § 4(f) [] mandates such interim goals." *Strahan*, 967 F. Supp. at 599. While the court's discussion of the plan's objective, measurable criteria was brief, it appears the court applied Section 4(f) narrowly and "afford[ed] the agency's decision a great deal of deference." *Strahan*, 967 F. Supp. at 598 ("all that is required in a recovery plan is 'the identification of management actions necessary to achieve the Plan's goals for the conservation and survival of the species.'") (citing *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107 (D.D.C. 1995)).

In *Center for Biological Diversity v. Zinke*, the court found the plaintiffs properly alleged that the Service failed to include objective, measurable criteria

addressing primary threats to the Mexican gray wolf. 399 F. Supp. 3d at 949-50. The court reasoned that it would be error for the agency to identify a primary threat affecting the species' recovery only to forgo addressing that threat in the recovery plan. The agency's failure "to address a problem that the agency itself identified, without offering and explanation as to why it was not practicable for the agency to do so" amounted to a proper challenge that the plan did not include objective, measurable criteria. *Zinke*, 399 F. Supp. 3d at 950 (citing *Fund for Animals*, 903 F. Supp. at 108) ("A recovery plan that recognizes specific threats to conservation and survival of threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA standard.").

Here, the Service should be awarded "a great deal of deference", especially since "[d]etermining how to provide for the conservation and survival of [bull trout] 'requires the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary.'" *Grand Canyon Trust*, 2006 WL 167560, *2 (D. Ariz. 2006) (quoting *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978)). The Court is also keenly aware that although Section 4(f) "does not permit an agency unbridled discretion . . . it does significantly constrain a court's review[.]" *Center for Biological Diversity*, 2020 WL 7640045, *9 (internal citations omitted). In consideration of these standards, and upon

careful review of the recovery plan, the Court disagrees with Plaintiffs' contention that the plan does not include objective, measurable criteria.

First, unlike the claims in *Zinke*, Plaintiffs are not alleging the Service identified primary threats to bull trout but failed to address those threats in the recovery plan. The Plaintiffs' challenge in this case is more like the claim in *Strahan*, where the plan's recovery criteria was allegedly insufficient to reach the level of "objective" and "measurable" as required under the ESA. As the court discussed in *Strahan*, although Section 4(f) generally requires the agency to incorporate objective, measurable criteria into the recovery plan, it does not mandate *how* the Service incorporates that criteria. Accordingly, nothing in Section 4(f) requires the Service to include "quantitative targets" or "benchmarks" as Plaintiffs contend. *See Zinke*, 399 F Supp. 3d at 948 (Section 4(f) requirements do "not mean that the agency can be forced to include specific measures in its recovery plan.") (quoting *Strahan*, 967 F. Supp. at 597-98). Nevertheless, the plan does include quantitative targets, just not to Plaintiffs' satisfaction.[4] *See* FWS00061-63; FWS00161-78.

---

[4] At oral argument on the cross-motions, Plaintiffs argued the Service's inclusion of a population goal set forth as a numeric target (i.e. Bull Trout are recovered in X water body if there is a population of 100 Bull Trout in that water body) would render the recovery plan "objective". Plaintiffs' argument lacks merit, as evidenced by legal challenges to such population goals set forth in recovery plans. *Strahan*, 967 F. Supp. at 599 (challenge to 7000 population recovery goal as "unrealistic"

The Service set forth a detailed recovery plan containing objective, measurable criteria. For example, the plan requires primary threats to bull trout to be effectively managed in core areas by either 75 or 100 percent, depending on the recovery unit. The number of core areas and local populations where the threats must be effectively managed have been predetermined by the service, as have the numeric minimum thresholds for attaining 75 or 100 percent effective management. FWS00062. For example, there are 20 core areas within the Coastal Recovery Unit. Within those 20 core areas, there are 84 local populations of bull trout. Primary threats to bull trout must be effectively managed in at least 15 (75%) of those core areas, representing at least 63 (75%) local populations of bull trout within the recovery unit. These are measurable criteria.

The Service also provided an explanation of how the primary threats it identified will objectively be deemed "effectively managed".[5] As previously discussed, the Service will employ a Threat Assessment Tool to guide the

and "meaningless); *Zinke*, 399 F. Supp. 3d at 949 (challenge to population goal that is unlikely to provide for the species' "conservation and survival"). These cases make clear that demographic criteria are also susceptible to objectivity challenges.

[5] The Service's focus on threats-based criteria rather than demographic criteria alone is consistent with the Service's Recovery Planning Guidance. *See, e.g.*, FWS05566 ("Identification of, and strategies for dealing with, the threats that are contributing to the status of the species as threatened or endangered, or are likely to recur in the foreseeable future, should be central to the recovery plan and program").

determination of whether threats have been effectively managed. The tool includes a workshop process where biologists familiar with bull trout in each core area will evaluate the status of bull trout by utilizing "existing empirical data on magnitude and trends in bull trout population counts or indices; current or historical spatial distribution, connectivity and extent of populations; expression of life history strategies; occurrence, magnitude, scope, trends, and severity of threats; and significant conservation measures that are ongoing or have been completed to address primary threats." FWS00108. These experts will make findings by using a "simple, but consistently applied decision matrix . . . to assess threat severity and management effectiveness for each identified primary threat in the core area." FWS00108.

The plan also sets forth guidance to aid the bull trout experts in considering threat severity and management effectiveness. FWS00165. The plan provides definitions of threat severity and management effectiveness, as well as an explanation of how threats are categorized and what impacts should be considered. FWS00165; *See also*, FWS00167-00169 (table showing the interrelation between bull trout pathways and indicators with assessment tool threat types); FWS00170-00181 (expository description of how to evaluate threat severity as minor, moderate, or high; and how to evaluate levels of management effectiveness). These determinations require consideration of objective data, including demographics.

FWS00170 (bull trout population trends, models, and status assessments should be considered when assessing severity); FWS00175 (management effectiveness "should be primarily supported where possible by data directly quantifying trends in the threat (e.g., lake trout population indices, fish passage data, sediment load measurements) in conjunction with data on historical changes in management. Surveys documenting bull trout population trends may also be used to inform this assessment to the extent that they can be attributed to particular threats.").

Finally, the plan includes objective criteria for the Service's assessment of threats effectively managed and evaluation of recovery unit status. FWS00176-00178. The plan requires the Service to consider objective data, including "available bull trout population information . . . the best available information (matrix cell assignments, supporting data, and rationales) provided to the Service by experts during the recovery unit workshops" and input from technical staff. FWS00176-00177. The Service will also rely on "evidence of demographically stable populations of bull trout" to achieve recovery of ecologically viable bull trout populations. FWS00177.

Considering the data-driven and expert involved process for determining whether primary threats to bull trout have been effectively managed, the recovery plan incorporates objective and measurable criteria as required under Section 4(f). Accordingly, the Court cannot find the Service's recovery criteria "ignore[d] the

required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. at 172.

Plaintiffs' remaining arguments object to the way the Service incorporated the

objective, measurable criteria and are therefore unreviewable under the ESA's

citizen-suit provision.

First, Plaintiffs argue the plan's 75% management threshold is not

scientifically based. Plaintiffs' grievance with this figure amounts to a substantive

disagreement with the agency's conservation strategy, a duty reserved to the

agency's discretion. Although Plaintiffs disagree with the basis for the agency's

chosen numeric, the agency is the proper party to determine which conservation

methods are necessary to protect bull trout. *Thorson*, 2017 WL 7310641, *10

(Plaintiffs' argument that agency's "conclusions are poor and not properly

supported . . . are not actionable under the citizen-suit provision of the Act.").

The Court is also not persuaded by Plaintiffs' urging that the recovery plan

must be based on the best available science.  First, the Service is not required to

base the recovery plan on the best scientific and commercial data available. This

Court has already decided this issue and Plaintiffs have offered no compelling

reason to disturb its prior holding. "Section 4(f), "unlike its statutory counterparts,

does not include a 'best available science' mandate[.]" *Center for Biological

Diversity*, 2020 WL 7640045 at * 10 (quoting *Ctr. for Biological Diversity*, 399 F.

Supp. 3d at 949). *See also*, *Grand Canyon Trust*, 2006 WL 167560, *2 n. 1

("Unlike 16 U.S.C. § 1533(b), section 1533(f), which regulates recovery plans, does not explicitly require that determinations be based on the best scientific and commercial data available.") and *Friends of the Wild Swan, Inc. v. Thorson*, 2017 WL 7310641, * 10 (D. Or. 2017) ("While § 1533(b) expressly provides the Secretary shall make the listing determinations and critical habitat designations . . . 'solely on the basis of the best scientific and commercial data available to him,' the language of § 1533(f) does not impose such a requirement with regard to the development and implementation of recovery plans and the court will not impose one.") (citing *Stewart v. Ragland*, 934 F.2d 1033, 1041 (9th Cir. 1991)).

Next, Plaintiffs allege that the Service failed to incorporate recovery criteria that address the five statutory delisting factors. (Doc. 1 at 13.)  Plaintiffs link this argument to the Service's non-discretionary duty to incorporate "objective, measurable criteria" into the recovery plan. (Doc. 1 at 13-14.) Plaintiffs' argument fails because Section 4(f) does not impose a mandate on the Service to include criteria addressing the five delisting factors. 16 U.S.C. § 1533 (f)(B)(ii).

The ESA requires the Service to incorporate into the recovery plan "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list[.]" 16 U.S.C. § 1533(f)(B)(ii). Plaintiffs argue that because the objective and measurable criteria would result in species delisting, the Service is required to

include the delisting requirements contained in 16 U.S.C. § 1533(c) in the recovery plan. Section 1533(c) provides that a delisting decision shall be "made in accordance with subsections (a) and (b)." 16 U.S.C. § 1533(c)(1). Subsection (a) contains the listing factors the Secretary must consider when determining whether a species should be listed. 16 U.S.C. § 1533(a). Subsection (b) requires the Secretary to make listing decisions "solely on the basis of the best scientific and commercial data available[.]" 16 U.S.C. § 1533(b).

The District of Arizona considered a similar argument in *Center for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 949 (D. Ariz. 2019). There, the plaintiffs similarly argued "that because recovery plans must include objective criteria that would result in the delisting of a species, and because delisting determinations must be based on the best available science, the criteria themselves must be based upon the best available science." *Zinke*, 399 F. Supp. 3d at 949. The court disagreed because Section 4(f) does not contain a best available science mandate.[6] The court also cited the difference between delisting criteria and

---

[6] *Compare,* 16 U.S.C. § 1533(b)(1)(A) ("The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available") with 16 U.S.C. § 1533(f)(B)(ii) ("The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable. . . incorporate in each plan . . . objective, measurable criteria which, when  met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list[.]").

recovery plan criteria, noting "[a]lthough the [Service] might logically aim to incorporate the best available science where practicable, whether the agency does so or not is a separate inquiry from whether the agency has produced a recovery plan that satisfies Section 4(f)." *Zinke*, 399 F. Supp. 3d at 949.

The court's reasoning in *Zinke* is directly applicable here. Section 4(f) concerns recovery criteria and does not impose a listing factor mandate. It is undisputed that the ESA requires the Service's delisting decisions to include the five listing factors. 16 U.S.C. § 1533(c)(2). But, Section 4(f) does not impose that requirement on the Service's incorporation of objective and measurable recovery plan criteria. The Court will not impose a duty on the Service not provided for under the ESA. *See Stewart*, 934 F.2d at 1041 ("When certain statutory provisions contain a requirement and others do not, we should assume that the legislature intended both the inclusion and the exclusion of the requirement.").

During oral argument, Plaintiffs for the first time urged the Court to engage in a *Chevron* statutory interpretation analysis of Section 4(f)(B)(ii), partially based on their contention that the *Zinke* court did not analyze the statutory language of Section 4(f) and therefore that decision should not be relied on by this Court. The Court does not agree. In reaching its conclusion that Section 4(f) does not include a best available science mandate, the *Zinke* court explicitly stated "[t]wo factors

inform this Court's review of § 1533(f) – the nature of recovery plans, *and the language of the statute*." *Zinke*, 399 F. Supp. 3d. at 947, 979 (emphasis added).

Plaintiffs also argued the *Zinke* case erroneously relies on *Grand Canyon Trust v. Norton*, which Plaintiffs claim does not support a finding that Section 4(f) does not require the Service to incorporate the best available science and statutory delisting factors in a recovery plan. The Court finds this argument unpersuasive. First, *Zinke* does not cite to nor rely upon *Grand Canyon Trust* to reach its conclusion that Section 4(f) does not include a best available science mandate. As discussed, the *Zinke* decision was based on statutory interpretation and the discretionary nature of recovery plans. *Zinke*, 399 F. Supp. 3d. at 947, 979. Additionally, the *Grand Canyon Trust* decision does support a finding that Section 4(f) does not require recovery plan determinations to be based on the best scientific evidence available. *Grand Canyon Trust*, 2006 WL 167560, at *2 fn. 1 ("Unlike 16 U.S.C. § 1533(b), section 1533(f), which regulates recovery plans, does not explicitly require that determinations be based on the best scientific and commercial data available."). [7]

---

[7] At oral argument, Plaintiffs contended the *Grand Canyon Trust* court's discussion of Section 4(f) did not explicitly analyze the "objective, measurable criteria" subsection, and therefore is inapposite to this Court's analysis. Plaintiffs' assumption that the *Grand Canyon Trust* court ignored the "objective, measurable criteria" provision of 4(f) is unsupported by the decision, especially since one of

The Court is further convinced that Section 4(f) imposes no requirement on the Service to include the listing factors in a recovery plan because of the nonbinding nature of recovery plans. As the Ninth Circuit has explained, "Recovery Plans are prepared in accordance with section 1533(f) of the Endangered Species Act for all endangered and threatened species, and while they provide guidance for the conservation of those species, they are not binding authorities." *Conservation Congress v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014) (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432-34 (D.C. Cir. 2012)). Rather, recovery plans "breathe[] discretion and every pore". *Fund for Animals*, 85 F.3d at 547.

In *Friends of Blackwater*, the District of Columbia Circuit aptly explained the distinction between the requirements for a recovery plan and the requirements for delisting a species. There, the plaintiffs challenged the Service's final rule delisting the West Virginia Northern Flying Squirrel because it ignored some of the criteria in the recovery plan. Interpreting the obligations Section 4(f) places on the Service, the court found that although the Secretary must "develop and implement plans for the recovery of any species designated as endangered. . . it does not follow, however, that with each criterion he includes in a recovery plan

the claims challenged the government's alleged failure to include "objective, measurable criteria" into the recovery plan.

the Secretary places a further obligation upon the Service. A plan is a statement of intention, not a contract." *Friends of Blackwater*, 691 F.3d at 433-34. The court emphasized that delisting criteria in a recovery plan is subject to the Service's discretion, while a final rule to delist a species explicitly requires consideration of the statutory listing factors. *Friends of Blackwater*, 691 F.3d at 432-33.

To be sure, at least two district courts appear to disagree with this interpretation of Section 4(f)'s requirements. In *Fund for Animals v. Babbitt*¸ the District Court for the District of Columbia concluded that pursuant to Section 4(f) the Service "in designing objective, measurable criteria, must address each of the five statutory delisting factors[.]" 903 F. Supp. 96, 112 (1995). *See also*, *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D. D.C. 2001) *and WildEarth Guardians v. Salazar*, 2009 WL 6443120, *3 (S.D. Tex. Dec. 7, 2009) (applying *Fund for Animals* Section 4(f) interpretation). However, the District of Columbia Circuit's findings in *Friends of Blackwater* are antithetical to the lower court's findings in *Fund for Animals v. Babbitt*, and therefore call into question the district court's Section 4(f) interpretation.

Additionally, as the court noted in *Thorson*, the *Babbitt* decisions did not concern "the viability of a citizen-suit challenging a recovery plan under [the ESA]." 2017 WL 7310641 at *9. Because the "court did not address the limitation on citizen suits brought pursuant to § 1540(g)(1)(C) to challenge only the failure of

the Secretary to perform an act or duty under § 1533 which is not discretionary[,]" the *Thorson* court found the decisions irrelevant. *Thorson*, 2017 WL 7310641 at *9. The Court agrees. The *Babbitt* cases do not hold that the Service has a non-discretionary duty to address the five statutory listing factors under Section 4(f), giving rise to citizen-suit jurisdiction under 16 U.S.C. § 1540(g)(1)(C). Neither the Ninth Circuit, nor any district court within this circuit, has found otherwise.

For all the preceding reasons, this Court declines to build a non-discretionary listing criteria mandate into Section 4(f). ESA recovery plan case law explicitly gives the Service broad discretion to determine the appropriate substance of recovery plans. The Ninth Circuit has deemed recovery plans guidance documents rather than binding authorities, and "all that is required in a recovery plan is the identification of management actions necessary to achieve the Plan's goals for the conservation and survival of the species." *Friends of the Wild Swan*, 2017 WL 7310641, *8 (D. Or. 2017) (quoting *Strahan*, 967 F. Supp. at 597) (internal quotations omitted). Just as this Court has found it may not review claims arguing the Service should be required to incorporate the best available science into recovery plans, a claim alleging the Service must incorporate the five statutory listing factors into a recovery plan "[a]t most . . . amounts to a mere disagreement over the ongoing validity of the objective and measurable criteria as listed in the

[recovery plan.]" *Center for Biological Diversity v. Bernhardt*, 2020 WL 7640045, *10 (D. Mont. Dec. 23, 2020).

Having concluded that the ESA does not impose a non-discretionary duty on the Service to include the five statutory listing factors into a recovery plan, this Court lacks jurisdiction over the Section 4(f) challenges raised in Count II of the Complaint. *Coos County Board of County Com'rs v. Kempthorne*, 531 F.3d 792, 802-04 (9th Cir. 2008) (United States does not waive its sovereign immunity and consent to be sued pursuant the ESA's citizen suit provision where plaintiff did not establish agency "failed to act on a nondiscretionary duty").

## IV.     CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED, and Defendants' Cross-Motion for Summary Judgment is GRANTED.

DATED this 22nd day of June, 2021.

_____
Kathleen L. DeSoto
United States Magistrate Judge